**IN THE COURT OF APPEALS OF IOWA**

No. 25-0300
Filed May 7, 2025

**IN THE INTEREST OF R.M.,**
**Minor Child,**

**R.M., Father,**
    **Appellant.**
_____

Appeal from the Iowa District Court for Pottawattamie County, Matthew A. Schuling, Judge.

A father appeals the termination of his parental rights to his child. **AFFIRMED.**

Abby L. Davison of Public Defender's Office, Council Bluffs, for appellant father.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Mandy L. Whiddon, Omaha, Nebraska, attorney and guardian ad litem for minor child.

Considered without oral argument by Schumacher, P.J., and Buller and Sandy, JJ.

**SCHUMACHER, Presiding Judge.**

A father appeals the termination of his parental rights to his son, R.M.[1] The father challenges the sufficiency of the evidence supporting the grounds for termination, claims termination is not in the child's best interests, and argues the Iowa Department of Health and Human Services (department) failed to make reasonable efforts toward reunification. Upon our review, we affirm.

**I.     Background Facts and Proceedings**

R.M. was born in 2013. In June 2023, R.M.'s family came to the department's attention upon concerns that the mother was using methamphetamine while caring for R.M. and R.M.'s younger half-sibling.[2] The mother has a lengthy history of substance use. She reported the family was being evicted from their home and was staying with friends. The children were adjudicated in need of assistance, and the mother agreed to the children's placement with a maternal aunt and uncle, where they have remained.

The father was incarcerated at the time of removal for possession with intent to deliver methamphetamine. When the father learned about R.M.'s removal, he began communicating with R.M. on the phone from jail.

Months passed without meaningful progress by either parent. The father was not responsive to caseworkers' attempts to contact him, and he failed to return their calls. The father also failed to maintain contact with the child, did not visit the child in person, and only attempted to communicate with the child when he was

---

[1] The mother's parental rights to R.M. and R.M.'s younger half-sibling were also terminated. The mother does not appeal.

[2] The father is not the biological father of R.M.'s younger half-sibling. The half-sibling's father died during these proceedings.

incarcerated. The father failed to provide the department with "any information regarding treatment, drug testing, housing, or employment."

The State initiated termination-of-parental-rights proceedings in December 2024. The termination hearing took place the following month. The father testified he was released from incarceration in "September or October" 2023, but then "relapsed" and his "communication with [R.M.] became less and less." The father became incarcerated again in June 2024. His most recent conversation with R.M. was in October 2024, on the child's birthday. The father stated he hoped to begin inpatient treatment in April and move to a halfway house when he was released on parole in August or September. He stated he took "full responsibility" for "not hav[ing] communication . . . and then also my incarcerations," but maintained "this time around, I'm looking to change my life" and "I really want my son in my life."

Meanwhile, R.M.'s aunt and uncle were willing to adopt him and his younger half-sibling. R.M. was thriving in their care. He enjoyed his new school, had made lots of friends, was participating in activities, and was earning good grades. The department caseworker reported R.M. had recently expressed "that he did not want to talk to his dad," due to their inconsistent communication and promises the father made but did not keep. The department and guardian ad litem opined termination of the father's parental rights would be in his best interests.

The court thereafter entered an order terminating the father's parental rights pursuant to Iowa Code section 232.116(1)(e) and (f) (2024). The father appeals.

**II.     Standard of Review**

We review termination-of-parental-rights proceedings de novo.  *In re A.B.*, 957 N.W.2d 280, 293 (Iowa 2021).  Upon our review, our primary consideration is the best interests of the child, *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006), the defining elements of which are the child's safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).  We give weight to, but are not bound by, the district court's fact findings.  *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018).

**III.    Analysis**

**A.     Grounds for Termination**

The father's rights were terminated on multiple grounds; we may affirm if any one of the grounds is supported by the record.  *See In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012).  We focus on paragraph (f), of which the father only challenges the fourth element—arguing the child could be returned to his custody "in a reasonable amount of time" because "he believed he would be released on parole in [a] few months."  However, this element is satisfied when the State establishes the child cannot be safely returned to the custody of the parent at the time of the termination hearing.  *In re T.W.*, No. 20-0145, 2020 WL 1881115, at *2–3 (Iowa Ct. App. Apr. 15, 2020); *see In re J.C.*, No. 24-1880, 2025 WL 548003, at *2 (Iowa Ct. App. Feb. 19, 2025) (noting the father's "current incarceration and still-pending criminal charges prevent J.C. from returning to his custody").  Iowa Code section 232.116(1)(f) was satisfied.

To the extent the father claims the court erred by failing to grant him additional time to work toward reunification, we disagree.  The termination hearing took place in January.  The father testified he hoped to be paroled to a halfway

house in August or September. He acknowledged that even if that happened, R.M. could not live with him at the halfway house. In short, the same safety and parenting concerns about the father that were initially present in August 2023 will continue to remain even if the father was granted an additional six months for reunification. *See In re A.A.G.,* 708 N.W.2d 85, 92 (Iowa Ct. App. 2005) ("In order to continue placement for six months, the statute requires the court to make a determination the need for removal will no longer exist at the end of the extension.").

## B.    Best Interests

Termination also must serve the child's best interests.[3]  To determine best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). The father has been incarcerated twice in the past two years, which caused his absence for most of the child-in-need-of-assistance proceeding. *See In re L.R.,* No. 25-0042, 2025 WL 855774, at *3 (Iowa Ct. App. Mar. 19, 2025) ("[T]he father downplays that his own criminal activity—not any action of the Department or the court—caused his absence from the first fifteen months of the son's life.").

Moreover, the father presented no evidence of his relationship with the child prior to 2023—aside "for roughly a year" in 2017—and there was no indication the department would approve the child living with the father even if he was not incarcerated.  *See In re N.F.,* 579 N.W.2d 338, 341 (Iowa Ct. App. 1998)

---

[3] We acknowledge that the State alleges the father has waived this issue. While the father's argument is skeletal, we choose to reach the merits of this claim.

("[C]hildren should not be forced to wait for their parent to grow up."). We further conclude that any bond between R.M. and the father is not enough to overcome termination given the child's stability and bonds in his current placement. *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (declining to apply the bond exception under section 232.116(3)(c) despite "some bond between" the parent and children, as the children had been out of the parent's care for nearly two years and had "achieved stability" in a relative's care). Termination is in R.M.'s best interests.

## C.  Reasonable Efforts

The father also contends the department failed to make reasonable efforts toward reunification.[4] Our courts have recognized that the State must show reasonable efforts toward reunification "as a part of its ultimate proof" that grounds for termination exist. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). Specifically, the father claims the department "failed to offer any assistance with transportation, visitation with his son, or suitable housing." He further claims the department failed to contact him "until the eve" of the termination hearing.

To the contrary, the record shows from the time of the initial department involvement in this case, caseworkers attempted to locate and communicate with the father. Family Access Center was willing to provide gas cards to assist with transportation costs, but the father was "not responsive" when a caseworker

---

[4] This issue of reasonable efforts does not appear to have been raised prior to the termination hearing before the district court. Indeed, the father alleges he preserved the issue for appellate review by raising such at the termination hearing. Where a parent "fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding." *In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002). However, we elect to address the merits of the father's claim concerning reasonable efforts.

reached out to schedule visits. As another caseworker recalled, "there was never any communication regarding [the father] reaching out back to them when they reached out to him to follow through with any assistance." The father also declined to pursue visits because the only people he knew who could supervise did not "have clean criminal histories."

With regard to housing, the father declined to provide any information to the department, other than that he "was living with a friend." As the caseworker explained,

> We did have a conversation—more than once—regarding he was living with a friend. He was not able to—he didn't have any informal supports to assist with transportation. We talked about that more than once, quite often in the beginning. We also discussed with the living situation, how that would be for a visit, and there was not a viable option for that.

The child eventually expressed he no longer wanted to see the father because the father was irregular in making contact and made promises that he failed to keep. As the court found, "While the parents have been offered substantial services to assist them in being reunited with their children, no parent has fully engaged in such services"; "[b]oth parents have failed to comply with the court-ordered services, and neither has established or maintained a prominent place of importance in the children's lives." In short, the father declined, ignored, or was unable to take advantage of services as a result of his own actions. We find the department met its reasonable efforts obligation.

We affirm the termination of the father's parental rights.

**AFFIRMED.**